IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CAROL KARCHNAK,** | : | **No. 07-CV-1405** |
| **Plaintiff** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **SWATARA TOWNSHIP,** <br> **DAVID BOGDANOVIC,** <br> **JASON D. UMBERGER, and** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

Plaintiff Sergeant Carol Karchnak has filed suit under 42 U.S.C. § 1983 against her former employer, Swatara Township, and her superior officers in the Swatara Police Department, Chief David Bogdanovic and Deputy Chief Jason D. Umberger.[1] Plaintiff alleges that each Defendant violated 1) her First Amendment right to be free of retaliation for the exercise of free speech and 2) her Fourteenth Amendment rights to equal protection of the laws and substantive and procedural due process.[2] After discovery, Defendants filed a motion for summary judgment. (Doc. 31.) That motion has been fully briefed by the parties and is now ripe for disposition. For the reasons that follow, the court will grant in part and deny in part Defendants' motion.

---

[1] In her original complaint, Plaintiff also sued Swatara Township Commissioner Ricci; however, in her Amended Complaint filed November 4, 2008, Plaintiff specifically states that "Ricci is dropped from this complaint and is no longer a defendant." (Doc. 27, ¶ 1.)

[2] Plaintiff states in her Amended Complaint that she is not seeking a "stigma plus" claim under the 14th Amendment for a deprivation of her liberty interest in her good name and reputation.

# I.  Background[3]

## A.  Facts

### 1.  Parties

The following facts are undisputed, except where noted.  Carol Karchnak was hired by Swatara Township as a police officer in 1986, became a dog handler in 1988, and a Sergeant in 1996.  (Defs.' Ex. 1 in Supp. of Mot for Sum. J., Carol Karchnak Dep. 18, 22.)  Defendant David Bogdanovic was hired by Swatara in 1979, and was promoted to Chief of Police in March 2004.  (Defs.' Ex. 2 in Supp. of Mot. for Sum. J., David Bogdanovic Dep. 6.)  Defendant Jason Umberger has worked at the Swatara Township police department for fifteen years, and was promoted to Captain and Deputy Chief on April 4, 2005.  (Defs.' Ex. 3 in Supp. of Mot. for Sum. J., Jason Umberger Dep. 10-11.)  Defendant Swatara Township Police Department ("the Department") is a municipal police department employing 43 full time police officers.  Defendants Umberger and Bogdanovic were Plaintiff's immediate supervisors.  The Department has policies including a chain of command, a sexual harassment policy, policies on internal investigations, supervisor responsibilities, concealment of violations and procedures or regulations, and a

---

[3]All citations to Defendants' exhibits in this case are to the set of exhibits that Defendants delivered to the court as a courtesy copy.  That set of exhibits contained 14 separate exhibits, including the entire deposition transcript of Plaintiff.  However, the exhibits docketed by Defendants in the court's CM/ECF system to Document 32 only contain Exhibits 1-5.  Those 5 CM/ECF exhibits contain most of the information in the exhibits submitted as a courtesy copy to the court; however, they are not separately labeled, and they are missing pages 106-164 of Plaintiff's Deposition.  It is unclear what exhibits were provided to Plaintiff, although Plaintiff's counsel does note in his reply to Defendants' statement of material facts that the copy of Plaintiff's exhibit cited by Defendants does not contain pages 155-156, (*See* Doc. 52 at ¶ 12), thus, the court presumes that Plaintiff received the CM/ECF exhibits.  In any event, Plaintiff does not claim to not have access to Plaintiff's deposition transcript or to have been prejudiced by the fact that the copy of Plaintiff's deposition attached to Document 32 in CM/ECF was missing pages 106-164.  Nonetheless, the record must be clear, and the court will order Defendants to re-docket the exhibits to Document 32 consistent with the courtesy copy that they provided to the court.  That is, Document 32 should have 14 separate exhibits containing each of the pages that Defendants submitted to the court as a courtesy copy.

policy on the role and authority of supervisors in regard to major misconduct. (Defs.' Ex. 4 in Supp of Mot. for Sum. J., General Order Manual of Swatara Twp. Police Dep't.)

## 2. **Evaluation System**

In 2005, the Department began to phase in a performance evaluation system, known as a z-based performance system.[4] (Karchnak Dep. 74.) Karchnak participated in the initial evaluation of the program along with Defendant Bogdanovic. (*Id.*, at 71-72.) The parties disagree about the usefulness of the program, and whether Plaintiff registered any complaints to the individual Defendants. Plaintiff asserts that she complained to Defendant Umberger in March 2006 about the implementation of the system because she believed that it inequitably evaluated officers. (Karchnak Dep. 73-74.) Specifically, Plaintiff felt that the metrics chosen for evaluation—such as how many business checks[5] were performed by each officer—did not take into account that officers would perform different tasks during different shifts, and depending on how many of a given shift an officer had for any given month, the officer's effectiveness as measured by the z-based system would vary. (Karchnak Dep. 73-74.) Thus, Plaintiff did not believe that the Department was implementing the system properly because it was comparing the same metrics for different shifts. (*Id.*) In his deposition, Defendant Umberger says that he has no recollection of Plaintiff ever taking issue with the z-based system. (Umberger Dep. 117.)

---

[4]The parties variously refer to this system as the "z-based system," the "zee-based system," and the "zero based system."

[5]A business check is where an officer checks on a business after hours by getting out of his or her car and checking every door and window to make sure that there are no problems. (Karchnak Dep. 72.)

### 3. **Dog Handling**

Among her duties, beginning in 1988, Karchnak served as a dog handler for the Department. (Karchnak Dep. 42.) In 2003, Karchnak was one of three dog handlers. (*Id.* at 30.) Around that time, another handler, Officer Mike Frey, filed a lawsuit against the Department alleging violations of the Fair Labor Standards Act because of the Department's failure to compensate dog handlers for their off-duty care and training of their dogs. (*Id.* at 30.) Plaintiff was not a party to this lawsuit, but she supported it and asked the Chief of Police at the time whether she could speak to the Board of Commissioners about the lawsuit and its implications; Plaintiff never spoke to the Board of Commissioners. (*Id.* at 32-33.) The lawsuit was settled, and, although Karchnak was not a party to the suit, she signed an agreement with the Department that provided compensation for her after hours care and training of her police dog. (*Id.* at 39.) After the case was settled, Karchnak approached Defendant Bogdanovic on several occasions about the possibility of speaking to the Board of Police Commissioners about the value of the canine unit, but those requests were denied. (Karchnak Dep. 34.)

Beginning in November 2001, the dog Karchnak handled was her own dog that she leased to the Department for its canine services. (*Id.*) At some point, she became the only dog handler for the Department. The parties dispute whether the lease for Karchnak's dog had a term of a specified number of years, or whether its term was more vaguely defined as the service life of Karchnak's dog. Plaintiff asserts that the lease was for the duration of the working life of her dog. (Karchnak Dep. 43.) Defendants assert that the agreement was coterminous with the collective bargaining agreement then in effect which expired on December 31, 2006. (*See* Defs.' Ex. 6 in Supp. of Mot. for Sum. J., Agreement & Release). The parties agree that the agreement could have been terminated by either side with or without notice.

(Defs.' Ex. 8, Dec. 8, 2006 Ltr. from Pl. to Def. Bogdanovic.)  In late November or early December 2006, Defendant Swatara Township gave notice to Plaintiff that effective January 1, 2007 it would be terminating the lease for Plaintiff's dog. (Defs.' Ex. 7, Nov. 21, 2006 Ltr. to Pl. from Paul Cornell.)  Rather then wait until January 2007, almost immediately upon receiving the November 21, 2006 letter from Defendants, Plaintiff wrote to Defendant Bogdanovic and informed him that she would cease providing canine services immediately.  (Dec. 8, 2006 Ltr.)  The Department has not had a canine program since December 8, 2006.  (Bogdanovic Dep. 21.)  Defendants assert that the canine program was cut for financial reasons. (Bogdanovic Dep. 13-18.)  Plaintiff believes that the canine program was cut in retaliation for her participation in the 2003 lawsuit.  (Karchnak Dep. 54-55.)

### 4. **Promotions**

After becoming a sergeant in 1996, Defendant at various times sought promotions within the Department.  Relevant to the instant case, in late 2005, Defendant Bogdanovic approached  Karchnak about the position of Detective Sergeant to see if she was interested.  (Bogdanovic Dep. 104.)  She stated she would consider the position, but was unsure whether she wanted it.  (*Id.*; Karchnak Dep. 154.)  Plaintiff never followed-up with Defendant Bogdanovic about her interest in the position until after she found out the job went to another person.  (Karchnak Dep. 155.)  Defendant Bogdanovic never again broached the subject with Plaintiff prior to informing her that someone else was promoted.  (*Id.*)  As indicated, Plaintiff did not get the job, but instead, Michael Farling was promoted to the position in February, 2006.  (Defs.' Ex. 5, in Supp. of Mot. for Sum. J., Michael Farling Dep. 17.)

## 5. **Brink's falsification of police logs**

In early January 2007, Ms. Karchnak learned that another sergeant had been falsifying his police activity logs, and that a probationary officer had copies of the falsified logs. (Karchnak Dep. 99.) Specifically, on either January 30th or 31st, Karchnak went into the ladies locker room and saw another female officer, Katrina Fiala, standing at the sink examining papers. (*Id.*) Fiala showed Karchnak two photocopies of patrol logs, one was Fiala's and another belonged to a fellow sergeant Donald Brink. (*Id.*) Fiala told Karchnak that she believed that Sergeant Brink had falsified his patrol log by indicating that he did over 40 business checks during a 3.5 hour block of time when in reality Sergeant Brink was at home during this time. (Karchnak Dep. 99.) Karchnak did not immediately report this anyone, but approximately 8-10 days later she received a call from the Police Association president—Darrell Reider—asking whether she knew anything about Brink falsifying his log. (*Id.* at 100.) In a colloquy with Defendants' attorney during her deposition, Karchnak testified that she did not report this information right away because:

> Well, it was something I really wasn't sure how to approach first of all. I wasn't sure that it was true. And I certainly don't want to—I don't want to be a tattletale and I don't want to tell stories about people that aren't true. I think that it is one of the worst things you can do is accuse somebody of something they haven't done. But after thinking about it, I did think that maybe I had a moral obligation to talk to someone else about it, somebody who might be able to give me advice on how to handle it.

(*Id.* at 101.)

As a result of the phone call from Darrell Reider, Karchnak decided to report the incident to Sergeant Mike Farling who is the Internal Affairs Officer. (*Id.*; Farling Dep. 5.) After speaking with Karchnak, Farling went to Defendant Umberger and relayed the information told to him by Karchnak. (Farling Dep. 5; Umberger Dep. 56.) After this meeting, Umberger and Farling met with Karchnak,

and Umberger ordered Karchnak to write a memo to Farling about what she knew of the incident. (Umberger Dep. 58-59.) Karchnak wrote a memorandum to Sergeant Farling on February 21, 2007. (Defs.' Ex. 10 in Supp. of Mot. for Sum. J., Feb. 21, 2007 memo from Karchnak to Farling.) The parties dispute whether Karchnak had a duty to report this incident up the chain of command. Plaintiff says that she had no duty to do so. (*See* Karchnak Dep. 101-102; Pl.'s Ex. in Opp. to Mot. for Sum. J., Karchnak Decl.) Defendants believe that Plaintiff did have a duty, and point to certain portions of the Swatara Township General Order Manual as evidence of Plaintiff's duty.[6] (Ex. 4 in Supp. of Mot. for Sum. J.)

---

[6]Specifically, Defendants point to the following General Orders:

**1.8.1.34 Internal Investigations**

    A.    Whenever there is a public criticism of the Swatara Township Police, or when complaints are received in connection with any police action, investigation or inquiry indicating misconduct of personnel; harassment or intimidation of subjects, individuals or groups; or dereliction of any nature by the Department or members of the Department, all members engaged in such police action, investigation, hearing or other inquiry shall prepare written statements at once, setting forth the facts in order that a record will be available for future reference and submit the same to the Internal Affairs Officer. Due to the internal administrative nature of such police action, investigation, hearing or other inquiry, all members are compelled to fully answer all questions relating thereto. Procedures in cases that will result in criminal prosecution will provide those rights afforded to al citizens.

**1.8.1.55 Reporting for Duty**

    A.    A member shall report for duty at the time and place specified by his superior officer and at that time be physically and mentally fit. Personnel not appearing for duty, scheduled hearings, court appearance, or other designated assignments on time, shall be in violation of this section and subject to disciplinary action.

    B.    A member is to be properly equipped so that he/she may immediately assume his/her duties. Being properly equipped for duty will include being cognizant of information from correspondence and directives, and additional information required for the proper performance of that tour of duty.

**1.8.1.74 Supervisor Responsibilities**

    A.    Responsibilities of supervisor personnel include the direct and indirect supervision of

(continued...)

officers in day-to-day operations, the communicating between line officers and superior officers and the reporting of unusual actions of both a [sic] positive and negative behavior by subordinate officers to superior officers. First line supervisors shall not be required to be present on every call or incident, but should be knowledgeable of incidents occurring under their command.

B.  Failure to supervise subordinate personnel shall be subject to disciplinary action.

C.  Failure to inform superior officers of incidents occurring during their tour of duty involving themselves or subordinates of any unusual action or situation shall be subject to disciplinary action. The CDO shall be notified in all instances of an injury or accident to an officer requiring medical treatment, reportable police vehicle accidents, firearms discharge, and any investigation involving a death or impending death of any persons.

D.  Other occurrences requiring immediate notification of a superior officers may be designated by the Chief or Captain of Police.

## 1.8.1.75 Concealment of Violations of Policy, Procedures or Regulations

A.  No officer shall attempt to or in fact conceal any violation of this Department's policy, procedures, or regulations.

## 1.8.1.80 Role and Authority of Supervisors

A.  Supervisory role in the disciplinary process.
1.  To observe the conduct and appearance of Swatara Township Police Officers and detect those instances when commendations are warranted.
2.  To observe the conduct and appearance of Swatara Township Police Officers and detect those instances when disciplinary action is warranted.
3.  To investigate allegations of employee misconduct, within the scope of their authority.
4.  To recommend the most effective methods of discipline, taking into consideration the behavior history and personality traits of the personnel under their supervision.
5.  To initiate disciplinary action through chain of command.
6.  To assess the conduct of work through performance and productivity measures by applying the Swatara Township Police Department's performance evaluation system.

B.  Supervisory Authority.
1.  Supervisors who personally observe employee misconduct have the authority to exercise limited disciplinary action.
    a.  If the misconduct is minor, such as a minor mistake, departure from procedure, or the exercise of inappropriate judgment, the supervisor may take immediate corrective action in the form of counseling/oral reprimand. This action alone does not enter the employee's personnel
    (continued...)

Karchnak was not investigated, nor was she disciplined for failure to follow the chain of command in reporting what she knew about the Brink incident. (Bogdanovic Dep. 66-67.) However, Defendant Umberger discussed the issue of disciplining Karchnak with Sergeant Farling, and Farling testified in his deposition that after the Brink incident he believed that Umberger had it in for Karchnak and that Umberger told him that Karchnak needs to "straighten up, watch her step." (Farling Dep. 37:16.) After the Brink incident, Plaintiff was disciplined, ostensibly, for other reasons.

## 6. Alleged Acts of Retaliation

In May of 2007, Karchnak received a written reprimand for her failure to supervise a subordinate with regard to the withdrawal of an improper parking ticket. (Defs.' Ex. 11 in Supp. of Mot. for Sum. J., May 7, 2007 Disciplinary Action Notice.) For her part, Plaintiff testified that this discipline was unwarranted because she did tell her subordinate—Officer Rory Dimov—to revoke the ticket. (Karchnak Dep. 122.) Included with the May 7, 2007, Disciplinary Action Notice

---

[6](...continued)
           file.

    b.    If the supervisor believes the nature of the misconduct warrants more severe disciplinary action, a disciplinary action report will be completed and forwarded to the Chief of Police.

    c.    If the misconduct is major, e.g., a violation of law of the employee reports to work under the influence of any/drug/or [sic] alcohol, the supervisor is authorized to restrict the employee from performing his/her official duties and require him/her to report to the Captain at the start of the next working day where the Captain is scheduled. (1.) The Deputy Chief and Chief of Police will be notified of any such action by the supervisor immediately. (2.) Reporting of the incident shall be in writing.

(*See* Defs.' Ex. 4 in Supp. of Mot. for Sum. J.)

was a Deficient Performance Notice indicating general problems with Karchnak's supervision. (Defs.' Ex. 13 in Supp. of Mot. for Sum. J., May 7, 2007, Deficient Performance Notice.) During a meeting with Defendant Bogdanovic after receiving these notices, Bogdanovic told Plaintiff that one of her deficiencies was her failure to properly report and handle the Brink incident. (Karchnak Dep. 107.) In June of 2007, Plaintiff received a second written reprimand again for failing to adequately supervise Officer Rory Dimov by ensuring that he maintained his J-NET[7] certification. (Defs.' Ex. 12 in Supp. of Mot. for Sum. J., Jun. 15, 2007 Disciplinary Action Notice.) These notices were received a few months after she informed Defendants of the Brink incident. Prior to receiving these notices, Plaintiff had never been formally disciplined in her over 20 years in the Department. (Karchnak Dep. 175.)

In October of 2007, Plaintiff was diagnosed for a second time with breast cancer. Plaintiff anticipated that she would be on leave for a significant period and run out of sick leave so she asked Defendant Umberger to ask Defendant Bogdanovic to request permission from the Board of Commissioners that other officers be allowed to donate sick leave. (Karchnak Dep. 110.) Plaintiff made this informal request in October, but placed a formal request in writing on December 28, 2007. (*Id*. at 112.) Plaintiff's request for donated sick leave was approved in mid-February 2008. (*Id.* at 113.) On August 1, 2008, Plaintiff retired from the Department.

---

[7]According to the Municipal Police Officers' Education & Training Commission, J-NET is an "integrated information technology system to support the collection and sharing of criminal justice information." *See* http://www.mpoetc.state.pa.us/mpotrs/cwp/view.asp?a=1133&q=441437 last visited 07/08/2009.

## B.    Procedural History

With leave of court, Plaintiff filed an Amended Complaint on November 4, 2008.  (Doc. 27.)  Defendants filed their answer on November 12, 2008.  (Doc. 28.)  On January 20, 2009, Defendants file a motion for summary judgment, (Doc. 31), and a brief in support.  (Doc. 32.)  After several extensions of time, Plaintiff filed her brief in opposition to Defendants' motion for summary judgment on March 2, 2009.  (Doc. 51.)  On March 23, 2009, Defendants filed their reply brief.  (Doc. 55.)  The motion is ripe for disposition by the court.

## II.  Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its]

own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.    **Discussion**

Plaintiff claims that she suffered violations of her First and Fourteenth Amendment rights, including her right to equal protection and due process, and that Defendants are liable for these violations pursuant to 42 U.S.C. § 1983. Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n.9 (1999) (internal quotation omitted). To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a

right secured by the Constitution and the laws of the United States and (2) that the alleged deprivation was committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993). "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.' " *Nicini*, 212 F.3d at 806 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

As to Plaintiff's First Amendment claim, Defendants argue that Plaintiff has not adduced facts demonstrating that she engaged in protected activity, because her speech was made pursuant to her official duties, and, thus, the *Garcetti* exception to First Amendment activity applies, and she has failed to prove a *prima facie* case of retaliation. In the alternative, Defendants argue that Plaintiff has failed to adduce any evidence that Defendants actually retaliated against her for any protected activity. As to Plaintiff's Fourteenth Amendment claims, Defendants argue that the undisputed facts demonstrate that Plaintiff did not suffer a violation of equal protection or due process. Defendants also argue that there is no evidence of any municipal action in this case, and, thus, Plaintiff's claims against Defendant Swatara Township fail as a matter of law. Finally, Defendants argue that the individual Defendants are entitled to qualified immunity on all of Plaintiff's claims. The court will discuss each of these arguments in turn.

A.      **First Amendment**

To establish a prima facie case of retaliation for engaging in First Amendment activity under 42 U.S.C. § 1983, Plaintiff must demonstrate that: (1) that the activity at issue is protected by the First Amendment, (2) that Defendants' adverse action was sufficient to deter a person or ordinary firmness from exercising

her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action. *Lauren W. ex. rel. Jean W. v. DeFalminis,* 480 F.3d 259, 267 (3d Cir. 2007); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) (stating the test in a slightly different way: "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action"). The first factor is a question of law; the latter factors are questions of fact. *Hill,* 455 F.3d at 241. Defendants can defeat the claim of retaliation by showing that it would have taken the same action even if Plaintiff had not engaged in protected activity. *Lauren W.*, 480 F.3d at 267 (citing *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).)

To meet the first prong of the *prima facie* case for retaliation, a statement made by a government employee is protected when: (1) is made by the employee in her capacity as a citizen; (2) the statement involved a matter of public concern; and (3) the government did not have an adequate justification for treating the speaker differently than a member of the general public. *Hill*, 455 F.3d at 242. The landscape for public employees making First Amendment retaliation claims has been significantly altered since the United States Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). As the United States Court of Appeal for the Third Circuit recently observed, "*Garcetti* simply 'narrowed the Court's jurisprudence in the area of employee speech' by further restricting the speech activity that is protected." *Reilly v. City of Atlantic City*, 532 F.3d 216, 228 (3d Cir.2008) (*quoting Foraker v. Chaffinch*, 501 F.3d 231, 241 (3d Cir.2007)). After *Garcetti*, a court analyzing a public employee's First Amendment retaliation claims must first consider whether the employee's speech is made pursuant to the employee's official duties. "[T]he First Amendment does not prohibit managerial discipline based on an

employee's expressions made pursuant to official responsibilities." *Garcetti*, 547 U.S. at 424.

Thus, the court is tasked with determining whether or not the expressive activity engaged in by Plaintiff was pursuant to her official duties as a sergeant in the Swatara Township Police Department. If it was, the speech is not protected and Plaintiff's First Amendment retaliation claim must necessarily fail. *Id.* If the speech was not made within her official duties, then the court must nonetheless determine whether Plaintiff was speaking as a citizen on a matter of public concern. If Plaintiff was not speaking as a citizen, or if the speech did not involve a matter of public concern, then Plaintiff's expressive activity falls outside the ambit of First Amendment protection. If, however, Plaintiff was speaking as a citizen on a matter of public concern, then the court must "employ the *Pickering* balancing test to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in promoting workplace efficiency and avoiding workplace disruption." *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir.2005) (*citing Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

Ordinarily, the court would proceed by analyzing the *Garcetti* issue first, and then, only if the court concluded that the speech in question was not within Plaintiff's official duties, the court would move on to the other aspects of Plaintiff's *prima facie* case. Here, however, neither party presents their evidence in this fashion; instead, both parties look at the discrete instances of alleged retaliation and barely discuss the remaining *prima facie* prongs. Therefore, the court will look at each of the discrete instances of alleged retaliation, and only address those factors of a *prima facie* retaliation case that are dispositive, including a *Garcetti* analysis, for each alleged instance of retaliation. Even this will be cumbersome, as Plaintiff's

attorney was less than stellar in presenting those instances where Plaintiff engaged in protected activity, and the alleged retaliation that followed. However, from what the court can glean, Plaintiff has alleged four instances of retaliation each of which she says was preceded by protected speech: (1) her failure to be promoted to Detective Sergeant in February 2006; (2) the termination of the dog handling contract in December 2006; (3) the delay in her request for donated sick time; and (4) the May and June 2007 discipline. The court will discuss each of these in turn.

### 1. Failure to receive promotion to Detective Sergeant in February 2006

In late 2005, Defendant Bogdanovic came to Plaintiff and asked her whether she would consider the position of Detective Sergeant, which was a promotion from sergeant. (Karchnak Dep. 154.) Plaintiff told him that she would have to think about it. (*Id.*) Plaintiff testified at her deposition that she did not think that the position would become open, and so she never went back to Bogdanovic to tell him that she was interested. (*Id.* at 155.) After that, Plaintiff heard nothing about the position until one morning when Bogdanovic told her that Mike Farling had been selected. (*Id.*) In her brief in opposition to summary judgment, Plaintiff argues that she did not get this promotion because "of her participation in the Dog Handler lawsuit, because she criticized the quota system as she saw it, and also because of her gender." (Doc. 51 at 13.) Defendants argue that Plaintiff has not demonstrated that she engaged in protected activity that preceded this denial, and therefore she failed to establish a *prima facie* case of retaliation. The court agrees with Defendant; Plaintiff has failed to establish that she engaged in protected activity that preceded this alleged retaliation.[8]

---

[8]The court will address Plaintiff's claim that she did not receive this promotion because of her gender when it discusses her Fourteenth Amendment claims in Part III.B. below.

The record is devoid of any competent evidence suggesting that Plaintiff's two stated instances of protected activity—the 2003-2004 dog handler lawsuit or her criticism of the z-based system—are protected activity under the First Amendment. A statement made by a government employee is protected when: (1) it is made by the employee in her capacity as a citizen; (2) the statement involved a matter of public concern; and (3) the government did not have an adequate justification for treating the speaker differently than a member of the general public. *Hill*, 455 F.3d at 242.

First, the record is clear that Plaintiff had nothing to do with the 2003-2004 dog handler lawsuit. That lawsuit was filed by another police officer in December 2003. Plaintiff was not a party to the suit, and Plaintiff did not testify at trial, and there is simply no evidence indicating that Plaintiff participated in any way in this suit. It is not significant that Plaintiff participated in the settlement of that lawsuit; she did so because she was a dog handler, not because of her involvement in the lawsuit itself. Plaintiff has pointed to no evidence in the record to support the bald assertion in her brief that she actually participated in the lawsuit, let alone that any participation was protected activity. In opposing summary judgment, Plaintiff must come forward with affirmative evidence in support of her claim, she has not done that in this instance, and the court finds that any involvement that she had with the 2003-2004 dog handler lawsuit was not protected activity under First Amendment.[9]

_____

[9]The only evidence of record that Plaintiff spoke up in support of the 2003 lawsuit comes from the following excerpt of her deposition:

> A:      . . . In fact, I had requested of Chief Mellot who was the chief at the time the lawsuit was filed and then again Chief Bogdanovic specifically asked if I could go speak to the Board about the lawsuit and the result of the lawsuit.
> Q:      What happened?

(continued...)

Second, it is clear from the record that Plaintiff's criticism about the z-based system was not made by her as a citizen; rather, it was made in her capacity as an employee. Plaintiff spends a number of pages explaining why she believed that the z-based system as administered by the Department was a quota system. (*See*

---

⁹(...continued)
A:     I was denied.

       . . .

Q:     As a follow-up to that, when did you make this request to Mellot if you recall?
A:     Immediately after the lawsuit was filed. They were served on December 6, 2003, and that was when I asked.
Q:     And how about the request to Bogdanovic?
A:     Actually I asked him several times. Between the time he became chief and they actually took my dog off the street – he became chief in March of '04 and they took my dog off the street in December of 2006 – he had actually approached me a couple of times saying that he might like me to address the Commissioners, give a presentation about the value of the K9 unit, the sort of things we did. As he wanted me to be ready for that. And I told him that I welcomed that opportunity because I felt that they had questions that has never been answered. And so when I would ask him when is this going to happen, it just – it never happened.

(Karchnak Dep. 32-33.) Plaintiff then goes on in her deposition to say what she would have said to the Commissioners had she been asked to address them:

A:     I would have explained to the Commissioners that what they did not realize was that under the law, under the Fair Labor Standards Act, they had an obligation to compensate the K9 handlers for the off-duty care of their dogs which they had never done and that if they had made some attempt with me to work that out, no employee could have ever come back and sued them because their obligation would have been fulfilled.

(Karchnak Dep. 34.) Putting aside the question of whether this speech would or would not have been made in her capacity as citizen rather than employee or would have concerned a matter of public concern, *Plaintiff did not make this speech*. Her deposition testimony clearly states that this is the speech that she would have made had she been given the chance. To the extent that Plaintiff asserts that her requests to then-Chief Mellot and Bogdanovic to speak to the board are what she alleges as protected activity, it is clear that these requests were not about matters of public concern, and were made as a result of the "specialized knowledge" or "experience"that she acquired through her job as a dog handler, and, thus, a part of her official duties that are not protected pursuant to *Garcetti*. *See Foraker v. Chaffnich*, 501 F.3d 231, 240 (3d. Cir. 2007) (holding that a claimant's speech might be considered part of his official duties and, thus, not protected activity under the Supreme Court's decision in *Garcetti*, if it relates to "special knowledge" or "experience" acquired through her job). The court discusses *Garcetti* and *Foraker* at length in Part III.A.4.i.a., below.

Karchnak Dep. 70-73.) However, she does not say that she mentioned any of these concerns to any of the Defendants. In fact, from the record before the court, it appears that Plaintiff spoke up about the z-based system only once:

> And so I said to [Defendant Umberger] – *because at one point I was low on business checks* and – I mean, of all people, the person who did the most – and I said to him, We [sic] specifically asked Dr. Van Meter about anything that was done on a particular shift; and he said that it has to be the same amount fo time for each unit, each platoon. And [Defendant Umberger] got angry with me and told me that it was based upon opportunity. And I said, Yes, [sic] that's what I'm explaining to you, that people who only work two weeks of midnight shift did not have the same opportunity as someone who worked two full months of midnight shift. And he argued with me then that they should be doing them on every shift.

(Karchnak Dep. 73-74 (emphasis added).) These statements were made to Defendant Umberger because Plaintiff was concerned that she was low on business checks. She was defending her record of productivity, and explaining that the methodology of evaluating productivity used by the Department was skewed. These comments are the only ones in the record that Plaintiff made about the z-based system, and based on the context of the speech the court concludes that these statements were not made by her as a citizen. Plaintiff was not complaining about the system *per se,* but rather the way that Defendants were implementing the system and using the data that they gathered. It is clear from Plaintiff's own statements that her concern stemmed from the fact that she was low on business checks. Thus, even if it could be said that Plaintiff spoke as citizen rather than employee on this issue, it is clear that her speech did not involve a matter of public concern, rather it concerned her personally or dealt with her concerns about the operation of the Department.

A public employee's speech involves a matter of public concern only if "it can be fairly considered as relating to any matter of political, social or other concern to the community." *Hill*, 455 F.3d at 243 n. 25. In determining if speech is a matter

of public concern, the court must consider the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Speech generally involves a matter of public concern if it "attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). Neither the content, form, or context of Plaintiff's speech concerning the z-based system leads the court to believe that it was made in an attempt to bring to light action or potential wrong doing on the part of the Department, and, therefore, it is not protected activity under the First Amendment.[10]

Thus, Plaintiff has failed to adduce evidence that she engaged in protected activity as it relates to her failure to receive the promotion to Detective Sergeant. Since this is an issue upon which Plaintiff will bear the burden at trial, the court will grant Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim insofar as it is based upon her failure to be promoted.

### 2. Cancellation of dog handling contract

In December 2006 Defendants terminated the lease for Plaintiff's dog effective January 1, 2007. Plaintiff asserts that this action—taken three years to the day after Defendants were served with Mike Frey's dog handling lawsuit—was done in retaliation for Plaintiff's support of that lawsuit.[11] Defendants argue that these claims are barred by the statute of limitations because the lawsuit occurred more

---

[10]The only other speech related to the z-based system identified by Plaintiff occurred at a supervisor's meeting in November 2006 which was over 8 months *after* Plaintiff did not get this promotion. Given this chronology, Plaintiff cannot establish a causal connection between this speech—even assuming that it is protected activity—and her failure to get the promotion.

[11]Incomprehensibly, Plaintiff's counsel argues in Plaintiff's brief in opposition that Plaintiff suffered retaliation "for filing the lawsuit i.e. for petitioning redress of grievances." (Doc. 51 at 15.) This assertion flies in the face of the evidence in the record that Plaintiff did not file the lawsuit, and that she did not participate in the lawsuit in any way. (*See* Karchnak Dep. 37-38.)

than two years before the filing of the complaint in this case. Defendants, however, misapprehend the application of the statute of limitations. It is immaterial for statute of limitations purposes when the alleged protected activity occurred; what matters is the timing of the alleged retaliation, because only where there is retaliation for protected activity does a cause of action accrue. *See Lauren W.*, 480 F.3d at 267 (stating that to state a First Amendment retaliation claim under § 1983 there must be (1) activity protected by the First Amendment, (2) adverse employment action, and (3) a causal connection between the adverse action and the protected activity).

Although not barred by the statute of limitations, Plaintiff's claim that the cancellation of her dog handling contract was in retaliation for her support of the 2003 lawsuit filed by Mike Frey suffers the same fate as her failure to promote claim: Plaintiff has adduced no evidence demonstrating that her support of this lawsuit was protected activity. The court addressed this at length in Part III.A.1, above and will not rehash it here. Even if it could be shown that Defendants cancelled the contract in an effort to spite Plaintiff—a conclusion the court does not reach in this case—without demonstrating that Plaintiff engaged in protected activity, and that there was a causal connection between that activity and Defendants actions, Plaintiff cannot maintain a cause of action for First Amendment retaliation under § 1983. *Id.* Thus, the court will grant Defendants' motion for summary judgment on Plaintiff's First Amendment retaliation claim in so far as it is based upon the cancellation of her dog handling contract.

### 3. <u>Delay in the approval of donated sick leave</u>

Plaintiff argues that Defendants unduly delayed the approval of donated sick leave in retaliation for filing the instant lawsuit. Assuming that Plaintiff could overcome the first hurdle for stating a *prima facie* retaliation case—that the lawsuit was protected activity— there is no evidence in the record that her request was

delayed, that any purported delay was adverse, or that this lawsuit was a substantial or causal factor in the delay.

Viewed in the light most favorable to Plaintiff, the facts surrounding her request for donated sick leave are as follows. In October 2007, Plaintiff was diagnosed with breast cancer. (Karchnak Dep. 110.) On October 16, 2007, Plaintiff went to the Department's offices looking for Defendant Bogdanovic because she wanted to request that he ask the Commissioners to ask other officers to donate sick leave. (*Id.*) Bogdanovic was not there that day so Plaintiff made her request to Defendant Umberger. (*Id.*) Plaintiff did not hear anything for a week, so she requested that her union representative Darrell Reider speak to the Defendant Bogdanovic. (*Id.* at 111.) In early November, Reider reported to Plaintiff that Bogdanovic told Reider that the Commissioners were concerned that if they allowed officers to donate sick leave that one of the officers would come back at them under the Fair Labor Standards Act and sue them for not paying overtime. (*Id.* at 112.) Later, Plaintiff spoke to Reider again in December 2007 and asked him to follow-up with Bogdanovic; when Reider did so, Bogdanovic told Reider to contact the Township Administrator Paul Cornell. (*Id.* at 113.) Cornell instructed Plaintiff to write a letter to him requesting donated sick leave; she did so, and her request for donated sick leave was approved in mid-February 2008. (Karchnak Dep. 113-114.)

Plaintiff contends that the delay between mid-October and mid-February was undue and retaliation for her filing the current lawsuit. To be clear, Defendants approved Plaintiff's request. Plaintiff simply argues that the amount of time that it took them was unreasonable and a retaliatory delay. There is scant evidence in the record to suggest that this length of time was either unreasonable or uncommon in requesting donated sick time. Plaintiff points to the fact that in 1999 when she requested donated sick time that it was approved much more quickly. She also

points to Bogdanovic's comment that the Commissioners were concerned about a possible lawsuit as evidence that Bogdanovic delayed dealing with the issue of her sick leave. However, this information does not help Plaintiff's *prima facie* case.

First, Plaintiff has to show that this delay was an adverse employment action. While it is true that even relatively minor actions by employers can be considered adverse employment action if they would "'deter a person of ordinary firmness' from exercising his or her First Amendment rights," the court does not believe that the evidence presented by Plaintiff could lead a reasonable jury to conclude that the length of time it took for Defendants to approve her donated sick time was retaliatory. *O'Connor v. City of Newark,* 440 F.3d 125, 128 (3d Cir. 2006) (citing *Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir. 2000)). This is particularly true coupled with the fact that Defendants ultimately approved the donated sick time, and that Plaintiff, during the time between her request and the approval, had sufficient sick leave. (Karchnak Dep. 118.)

Second, even assuming that Plaintiff had adduced sufficient evidence that the delay by Defendants was an adverse employment action, there is no evidence tying this delay to the filing of the instant suit. Plaintiff does not argue in her deposition or her brief that the temporal proximity between these two events is a factor, and the court will not become an advocate and make that argument for Plaintiff. Rather, Plaintiff baldy asserts, in the last sentence dealing with this topic, that "Karchnak contends that these defendants' (Swatara and Bogdanovic) cruel retaliation were [sic] for filing the current lawsuit." (Doc. 51 at 17.) Plaintiff points to no evidence in the record to support this claim. Plaintiff also argues that "[o]nly after her attorney amended her complaint did defendants Bogdanovic and Swatara relent on making the sick time available." (*Id.*) Plaintiff does not explain how these events chronologically relate to each other. In fact, as Defendants point out, what

Plaintiff's counsel alleges cannot be true: Plaintiff's request for donated sick time was approved in late February or early March 2008, (Karchnak Dep. 113-114), and the Amended Complaint was not filed until November 4, 2008, well after the approval of her donated sick time. (Doc. 27.)

Plaintiff has simply failed to meet her burden of producing evidence from which a reasonable jury could conclude that the Defendants delay in approving her sick time was an adverse employment action, and, even if it was, that there is a causal connection between her protected activity—the filing of this lawsuit—and that adverse action. Accordingly, the court will grant Defendants' motion for summary judgment as to Plaintiff's First Amendment claims in so far as they are based upon the delay in the approval of donated sick time.

### 4. Written Discipline

In May of 2007, Karchnak received a written reprimand for her failure to supervise a subordinate with regard to the withdrawal of an improper parking ticket. At the same time she received a deficient performance notice listing this, and other generalized deficiencies concerning her supervision. In June of 2007, Plaintiff received a second written reprimand again for failing to adequately supervise Officer Rory Dimov by ensuring that he maintained his J-NET certification. These notices were received a few months after she informed Defendants of the Brink incident. Prior to receiving these notices, Plaintiff had never been formally disciplined in her over 20 years on the police force. Plaintiff contends that both instances of discipline were in retaliation for Plaintiff having spoken out about Sergeant Donald Brink falsifying his patrol logs. Defendants argue that Plaintiff's speech about Sergeant Brink was made pursuant to her official duties as a Sergeant in Swatara Township Police Department, and, therefore, under *Garcetti*, Plaintiff's speech was not protected activity.

Because the court will discuss all of the elements of a First Amendment retaliation claim in this section, it is helpful to step back and look at what it is that Plaintiff must demonstrate. In order to state a First Amendment retaliation claim under § 1983, Plaintiff must demonstrate that: (1) that the activity at issue is protected by the First Amendment, (2) that Defendants' adverse action was sufficient to deter a person or ordinary firmness from exercising her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action. *Lauren W.*, 480 F.3d at 267. Under the first prong of this test, a statement made by a government employee is protected when: (1) it is made by the employee in her capacity as a citizen; (2) the statement involved a matter of public concern; and (3) the government did not have an adequate justification for treating the speaker differently than a member of the general public. *Hill*, 455 F.3d at 242. In *Garcetti*, the Supreme Court narrowed the first prong of the test determining whether speech is protected. However, if Plaintiff makes it past *Garcetti*, she still must meet the other prongs of the protected activity test, and then demonstrate that she suffered adverse employment action causally related to her protected activity. The court will address each of these issues as they relate to the May and June 2007 discipline received by Plaintiff.

### i. **Protected Activity**

### a. *Garcetti*

In *Garcetti*, the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. *Garcetti* concerned a deputy district attorney who claimed retaliation for writing a memorandum in which he recommended dismissal of a case on the basis of alleged governmental

misconduct.  The Supreme Court found that "Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings.  In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case."  *Id.*  The Court reasoned:

> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction. The significant point is that the memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* at 421-22.

The Supreme Court distinguished between "[e]mployees who make public statements outside the course of performing their official duties [who] retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government," and "a public employee [who] speaks pursuant to employment responsibilities."  *Id*. at 423. Accordingly, the Supreme Court limited its holding "only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints . . . that are made outside the duties of employment."  *Id.* at 424. Because there was no dispute that Ceballos' memo had been written pursuant to his employment duties, the Supreme Court did not articulate a "comprehensive framework for defining the scope of an employee's duties," although the majority did reject the dissent's concern that public employers could restrict employees' rights by creating excessively broad job descriptions, directing that "[t]he proper inquiry is a practical one" because "[f]ormal job descriptions often bear little

26

resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424-25.

Here, Defendants allege that *Garcetti* controls because Plaintiff's contact with Sergeant Farling, the Internal Affairs Officer, was a part of her duty. In support of this contention, Defendants assert that Plaintiff, like all Swatara Township Police Officers, "was subject to the Swatara Township Police Department Code of Ethics," and the Swatara Township General Order Manual, which Defendants allege required Plaintiff to report the misconduct, and, thus doing so was a part of her official duties. (Doc. 32 at 17-18; *see supra,* n.7 for text of these orders) Plaintiff rather baldly asserts that reporting this misconduct was not within her official duties. Of course, the court realizes that it is more difficult to prove a negative—that the reporting was not within her official duties—than it is to prove a positive—that it was. The court will address the parties arguments, but first will examine recent Third Circuit case law that sheds some light on *Garcetti.*

The cases decided by the Third Circuit since *Garcetti* appear to turn on whether the activity or speech performed by a public employee is within the "scope of their routine operations." *See Foraker v. Chaffnich*, 501 F.3d 231, 241-42 (3d Cir. 2007). In *Foraker*, three Delaware State Police firearms instructors complained to their superiors about the conditions of the firing range. They considered the range conditions intolerable, and were specifically concerned because the HVAC system did not work properly, the bullet trap was malfunctioning, and officers and students at the range were suffering the physical manifestations of contamination, including elevated levels of heavy metals in their blood. *Id.* at 233. In addition to complaining up the chain of command, the three officers also met with the State

Auditor who was conducting an investigation of the facility. After this meeting, the attorney for the three officers read their statements to the Auditor, verbatim, to the Delaware State News. *Foraker,* 501 F.3d at 233. The Third Circuit, affirming the district court's decision to grant judgment as a matter of law to the Defendants, analyzed *Garcetti* and held that the officers' complaints to supervisors of unsafe conditions at the firing range were made pursuant to their official duties because it was clear that the issues they complained of related to their day-to-day employment responsibilities:

> [The officers] were acting within their job duties when they expressed their concerns up the chain of command because they needed to have a functioning bullet trap to conduct their educational programs and it was their special knowledge and experience with the bullet trap that demonstrated their responsibility for ensuring its functionality by reporting problems to their superiors.

*Id.* at 240. The Third Circuit went on to say that "[t]he special knowledge and experience referenced here is their daily interaction with the equipment, which puts them in the position to know when problems arose." *Id.* at 204 n.6. Finally, the Third Circuit recognized that while giving statements to the State Auditor was not part of their everyday duties, the controlling factors was the fact that the prior statements of the officers within the chain of command was within their daily duties and that is what prompted the order to speak to the Auditor. *Id.* at 243.

In *Gorum v. Sessoms*, 561 F.3d 179 (2009), the Third Circuit further refined its *Foraker* analysis. In that case, a tenured faculty member of Delaware State University argued that his dismissal was in retaliation for his serving as an advisor to an All-American football player who violated the school's zero-tolerance policy against weapons possession, and for his rescission of an invitation to the school's President to speak at a prayer breakfast. The Third Circuit rejected the plaintiff's argument that because he went above and beyond his specified

responsibilities as an employee that he was speaking as citizen rather than employee. Relying on its decision in *Foraker,* the Third Circuit found that it was "Gorum's special knowledge of, and experienced with" the school's disciplinary code that gave him the opportunity to speak on the student's behalf, and it was his position as faculty advisory to the fraternity that allowed him to rescind the President's invitation to speak. *Gorum,* 561 F.3d at 186. In reaching this conclusion, the Third Circuit relied on the Supreme Court's direction in *Garcetti* that the "'proper inquiry' into what are an individual's's official duties 'is a practical one.'" *Id.* at 185 (quoting *Garcetti,* 547 U.S. at 424.)

The other published Third Circuit opinion addressing the scope of Garcetti's official duties doctrine was *Reilly v. City of Atlantic City*, 532 F.3d 216 (2008). In *Reilly*, the Third Circuit was faced with whether to grant qualified immunity to the defendants on the plaintiff's First Amendment claim because the plaintiff's speech was made pursuant to his job duties. There, among other speech, Reilly testified on behalf of the government in a corruption trial against members of the Atlantic City Police Department and was later disciplined. The Third Circuit analyzed the case law on the issue of a citizen's obligation to testify truthfully in court and held that Garcetti did not reach the question of whether truthful testimony in court is subject to the same analysis as other speech. *Reilly*, 532 F.3d at 231. Ultimately the court held:

> [T]he action of offering truthful testimony is the responsibility of every citizen, and the First Amendment protection associated with fulfilling that duty of citizenship is not vitiated by one's status as a public employee. That an employee's official responsibilities provided the initial impetus to appear in court is immaterial to his/her independent obligation as a citizen to testify truthfully. When a government employee testifies truthfully, s/he is not "simply performing his or her job duties," rather, the employee is acting as a citizen and is bound by the dictates of the court and the rules of evidence.

*Reilly*, 532 F.3d at 231. (internal citations omitted). Thus, even if an employee's official responsibilities compel him to appear in court, testimony under oath, is the sort of conduct performed by citizens and protected by the First Amendment. *Id*.

It is clear from this precedent that where a claimant's speech relates to "specialized knowledge" or "experience" acquired through the claimant's job that speech falls within the claimant's official duties, and is thus not protected under *Garcetti. See Foraker,* 501 F.3d at 240; *Gorum,* 561 F.3d at 185. Furthermore, where independent duties compel an employee to speak—such as being called to testify truthfully at trial—the fact that it is a part of one's job is immaterial. *Reilly*, 532 F.3d at 231. This guidance from the Third Circuit is useful, though not dispositive, because it appears to this court that the Third Circuit has shortened slightly the reach of the "official duties" doctrine of *Garcetti.*

The facts present in this case demonstrate that Plaintiff reported her belief about Brink's falsification of his logs to Farling not because she believed that she was required to do so, but rather because she was seeking his advice about what to do. Farling testified at his deposition that Plaintiff came to him because she was seeking advice on whether to report Brink based on the information that she had. (Farling Dep. 6.) It is undisputed that Brink was a fellow Sergeant of equal rank of Plaintiff, not one of her subordinates. It is also undisputed that the only information that Karchnak had at the time she spoke to Farling was an unconfirmed report from Fiala that Brink was falsifying his logs. There is no evidence in the record that Karchnak's official duties included reporting up the chain of command potential misconduct of her fellow sergeants whatever the context in which these reports were made or the information supporting them. While it may have been prudent, there is scant evidence that it was required. Contrast this with *Garcetti* where there was no dispute that Ceballos' duties as calendar deputy included investigation of the

concerns at issue, and advice his supervisors regarding pending criminal cases. *See Garcetti*, 541 U.S. at 421 ("The controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy. . . . Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do.")  Under these circumstances, the Supreme Court found that the plaintiff was doing what he was employed to do, and was therefore acting not as a citizen but as a government employee whose speech did not qualify for First Amendment protection.  *Id*.

Here, unlike *Garcetti*, the parties dispute whether Karchnak's reporting that a fellow sergeant was potentially falsifying his police logs was part of her ordinary job duties or core function as a sergeant.  Furthermore, unlike *Foraker* and *Gorum*, there is nothing in the record to suggest that Karchnak had "specialized knowledge" or "experience" about the issues she complained of, or that they were within the day to day functions that she was expected to perform.  *See Foraker,* 501 F.3d at 240; *Gorum,* 561 F.3d at 185.  Defendants point to the Department's Code of Ethics and General Orders 1.8.1.34, 1.8.1.74, 1.8.1.75, and 1.8.1.80 as evidence that reporting alleged falsification of patrol logs by another sergeant was within Plaintiff's official duties.

As a general matter, the Supreme Court addressed a similar point in *Garcetti:*

> We reject . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. . . . The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary not sufficient to demonstrate that conducting the task is within the scope of the employees professional duties for First Amendment purposes.

547 U.S. at 424-25.  The same reasoning stands when the evidence presented by Defendants is a Code of Ethics and General Orders applicable to all officers in the Department; simply because something is listed as an obligation of all officers does not mean that it is within the specific, "professional duties" of a given employee.  *Id.*  Thus, while probative of Plaintiff's job duties, the evidence presented by Defendants is not dispositive of those duties.  This is even more apparent upon examination of the specific provisions submitted by Defendants.

None of the General Orders cited by Defendants discuss the responsibilities of sergeants when they learn of potential misconduct by other sergeants; rather they are merely generalized orders requiring all department employees to conduct themselves in certain ways.  Without more, the court will not construe them to mean that Plaintiff had an employment duty to report all matters involving rumors of misconduct, regardless of the context, source, or content of the information received, to her supervisors.  The provision of the Code of Ethics cited by Defendants is even broader and more generalized than the General Order Manual,[12] so broad and generalized, in fact, that if the court gave it the construction that Defendants want it would sweep the Supreme Court's admonition that "[t]he First Amendment protects some expressions related to the speaker's job."  *Garcetti,* 547 U.S, at 421.  Indeed, *Garcetti* is not a shield that public employers can put up to guard against all claims of retaliation, and the Supreme Court did not create an

_____

[12]Defendants cite the following from the Police Department Code of Ethics:

I vow to be fully truthful and honest in my dealings with others.  I deplore half-truths that mislead or do not fully inform those who must depend on my honesty.  I will obey the very laws that members of my police department are sworn to uphold.  I will seek affirmative ways to comply with the standards of the agency and the lawful directions of my supervisors.

(Defs.' Ex. 14 in Supp. of Mot. for Sum. J., Swatara Twp. Police Dep't. Code of Ethics)

impermeable rule that all speech by government officials, no matter the facts presented, is fully engulfed by a public employee's governmental duties. To the contrary, only if it can be shown that the speech was unquestionably a part of Plaintiff's duties can the court grant summary judgment.

The record before the court does not clearly establish that Karchnak spoke about Brink's falsification of his police logs as a part of the discharge of her duties as a sergeant in the Department. While Defendants have adduced some evidence that this may be the case, Plaintiff has come forward with sufficient evidence to create a genuine issue of material fact as to whether Plaintiff was acting pursuant to her official duties.[13] On the record before it, the court cannot declare as a matter of law that the facts demonstrate that Plaintiff's speech was within her official duties, thus the court will defer ruling on this issue until trial where the facts may be more fully developed.[14] The court will now turn to whether Karchnak's speech addressed a matter of public concern.

### b. Matter of Public Concern

The court turns next to the second element of the protected activity analysis, namely whether Plaintiff's statements to Farling and in her memo concerning Brink's falsification of his police logs involved matters of public

[13]It is immaterial to the court's analysis that Karchnak wrote a memo to Farling on February 20, 2009 at Defendant Umberger's direction. While it may literally be true that when ordered to do something by her commanding officers that she was under a duty to do so, this fact alone does not locate Plaintiff's speech within the realm of her job duties. What is dispositive is whether or not the initial speech which prompted the order—her speaking to Sergeant Farling—was within her job duties. *See Foraker,* 501 F.3d at 243. If it was not, then Defendants cannot bootstrap the speech into an official duty by ordering Plaintiff to make it.

[14]In *Foraker* the Third Circuit stated that "the question of whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." 501 F.3d at 240. Here, there is simply an insufficient factual record for the court to conclude whether Plaintiff's speech was within her official duties or not. At trial, this matter can be decided by specific interrogatories to the jury. If the jury decides that Plaintiff's speech was performed as a part of her official duties then the court will grant Defendants judgment as a matter of law.

concern. A public employee's speech involves a matter of public concern if "it can be fairly considered as relating to any matter of political, social or other concern to the community." *Hill*, 455 F.3d at 243 n.25. In determining if speech is a matter of public concern, the court must consider the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138 (1983). Speech generally involves a matter of public concern if it "attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Baldassare,* 250 F.3d at 195.

Neither of the parties address this prong of Plaintiff's *prima facie* case in their briefs, and so the court will not address it at length; however, based on the record before it, the court concludes that Karchnak's statements about Brink's falsification of his police logs involved matters of public concern because they clearly implicate potential wrongdoing and misconduct by a member of the Department. *See Baldassare*, 250 F.3d at 197 ("Needless to say, allegations of corrupt practices by government officials are of the utmost public concern.")

### c.     Balancing the interests

Having determined that Karchnak's expressive activities implicate matters of public concern, the court turns to the final element of the protected activity inquiry. To determine whether Defendants had adequate justification for treating Karchnak differently from a member of the general public, the court must balance "the interests of the employee . . . in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Barry v. Luzerne County*, 447 F. Supp. 2d 438, 445 (M.D. Pa. 2006). In determining the government's interest, the court should consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for

which personal loyalty and confidence are necessary . . . impedes the performance of the speaker's duties, or interferes with the regular operation of the enterprise." *Barry*, 447 F. Supp. 2d at 445-46.

Again, the parties do not brief this prong of the protected activity analysis. On Karchnak's side is the public's strong interest in uncovering wrongdoing by public officials, such as police officers. On Defendants' side is the strong interest of the Department in regulating employee speech that could have a detrimental impact on efficient law enforcement. However, given that all of Karchnak's speech in this case was internal rather than external, the court finds that the balance tips in favor of Plaintiff. There is no evidence suggesting that Plaintiff's speech in any way undermined the effective operation of the Department, without this, Defendants can hardly claim that they were detrimentally impacted.

### ii.  Sufficient to deter a person of ordinary firmness

Once Plaintiff has adduced evidence that she engaged in protected activity, she must then demonstrate that the alleged retaliation would be sufficient to deter a person of ordinary firmness from exercising her rights. *See Lauren W.,* 480 F.3d at 267. The threshold for adverse action is relatively low. "Even 'an act of retaliation as trivial as failing to hold a birthday party for a public employee,' if 'intended to punish her for exercising her free speech rights,' may be actionable if under the circumstances it would be sufficient to 'deter a person of ordinary firmness' from exercising [her] First Amendment rights." *Suppan v. Dadonna,* 203 F.3d 228, 234-35 (3d Cir. 2000) (citing *Rutan v. Republican Party,* 497 U.S. 62 (1990).)

Based on a review of the record, the court determines that there is a genuine issue of material fact about whether the May and June 2007 disciplinary action reports would deter a person of ordinary firmness from exercising their First Amendment rights. These disciplinary action reports followed closely Plaintiff's

reporting of her knowledge of Brink's police log falsification. Prior to reporting this incident, Plaintiff had an exemplary record and no recorded discipline. Defendants make light of the discipline by stating that "nothing adverse . . . happened to [Plaintiff] as a result of these reprimands other than them being placed in her file." (Doc. 32 at 18.) This is sufficient. A reasonable jury could conclude that these written reprimands—that are still in Plaintiff's personnel file maintained by the Department—if done for retaliatory reasons, are sufficient to deter a person of ordinary firmness from exercising her constitutional rights in the future, and as such this is an issue for the jury to decide not the court.

### iii. Substantial factor/causal connection

Once Plaintiff adduces evidence that she engaged in protected activity and that the retaliation was the type that would be sufficient to deter a person of ordinary firmness from exercising her constitutional rights, she must show that the "the protected activity was a substantial or motiving factor in the retaliatory action." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003); *Hill*, 455 F.3d at 241; *see also Lauren W.*, 480 F.3d at 267 (stating the test as requiring a "causal connection" between the alleged retaliation and the protected activity).

Defendants argue that Plaintiff has failed to adduce any evidence that her discipline was motived by her protected activity. While it is true that much of the record is muddied with Plaintiff's myopic view of events wherein everything that Defendants did was permeated with retaliatory motive, given the timing of the discipline in close temporal proximity to Plaintiff's protected activity, the fact that Plaintiff had never been disciplined before, and the genuine dispute by Plaintiff about whether discipline was warranted given the facts underlying each Disciplinary Action Report, it is plausible that a reasonable jury could conclude that Plaintiff's protected activity was a substantial factor motiving Defendant's discipline. Given

the admonition that the court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party, the court finds that Plaintiff has met her burden of producing more than a scintilla of evidence from which a reasonable jury could rule in her favor. *See Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

### iv. Whether Defendants would have taken the same action in the absence of Plaintiff's protected activity

Once Plaintiff has come forward with sufficient evidence to support her claim of retaliation, Defendants can defeat that claim by demonstrating that they would have taken the same adverse action in the absence of Plaintiff's protected conduct. *Hill,* 455 F.3d at 241 n.23 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).) Here, Defendants argue that the facts underlying Plaintiff's reprimands support those reprimands and that they would have been issued even if Plaintiff had not complained about Brink's falsification of police logs. While this may be Defendants contention, the facts are not undisputed, and since this is a fact intensive issue it is within the province of the jury, not the court on summary judgment.

The first Disciplinary Action Report was issued on May 7, 2007—five months after she first reported the Brink's police log issue to Sergeant Farling—for Plaintiff's purported failure to have one of her officers revoke an improvidently issued parking ticket. Defendants obviously stand behind their issuance of this reprimand; however, Plaintiff contends that it should have never been issued because she told Officer Dimov to revoke the ticket and noted that she had done so in her supervisor's report. (See Karchnak Dep. 122-24.)

As a result of this Disciplinary Action Report, Plaintiff was given a Deficient Performance Notice which included a laundry list of vague and

generalized deficiencies concerning Plaintiff's supervision. (See Defs.' Ex. 13 in Supp. of Mot. for Sum. J.) Plaintiff returned this notice and committed to improve her performance in a similarly vague and generalized way.[15] (*Id.*)

Finally, on June 15, 2007, Plaintiff received another Disciplinary Action Report, again for her alleged failure to supervise Officer Dimov. Officer Dimov had allowed a certification to lapse, and Defendant Umberger told Plaintiff that he wanted an explanation from Dimov in writing as to why the certification lapsed. (Karchnak Dep. 139.) Plaintiff told Dimov that she wanted him to write her an explanation for the lapse so that she could report back to Defendant Umberger. (*Id.*) Instead of writing to Plaintiff, Officer Dimov e-mailed Defendant Umberger directly and copied Plaintiff. (*Id.*) Since Plaintiff believed that this satisfied Defendant Umberger's requests, she did nothing more to follow-up. (*Id.* at 140.) She was then given the June 15, 2007 written reprimand for her failure to follow the chain of command and recommend discipline for Officer Dimov. Plaintiff concedes the facts as written in the June 15, 2007 reprimand, but contends that they did not warrant discipline. (*Id.* at 140.) In this case, Defendants assert that Plaintiff's admissions that her performance was deficient by returning the Deficient Performance Notice is an admission that the discipline would have happened even in the absence of Plaintiff's protected activity.

Despite Defendants assertions to the contrary, a reasonable jury could conclude that Defendants discipline was pretextual. Plaintiff disputes all of incidents of discipline. As to her alleged failure to order Officer Dimov to revoke

---

[15]For instance, the Deficient Performance Notice states that Plaintiff's performance was deficient because she did not "Display[] leadership in making informed & proper decision-making involving criminal/civil/other incidents that have occurred during your command." (Defs.' Ex. 13 in Supp. of Mot. for Sum. J.) In response, Plaintiff stated that "I will display leadership in making informed and proper decision-making involving criminal/civil/other incidents that occur during my command. . . ." (*Id.*)

the improvidently issued parking ticket, Plaintiff states that she did tell him to do so, and that she noted the same in her report. (Karchnak Dep. 122-24.) Similarly, as to Dimov's failure to remain J-Net certified, Plaintiff's explanation of why she did not follow-up with Dimov is tenable. While she may not have followed Department protocol in each of these instances, given that she had never before been written-up in her more than 20 years as a police officer, and given the relatively *de minimis* nature of the alleged deficiencies, a reasonable jury could conclude that these reprimands were done in retaliation for her protected activity, and that Defendant's facially neutral explanations were pretextual. Furthermore, the general and vague nature of the Deficient Performance Notice would provide an ample basis for a jury to conclude that Defendants were not overly concerned about Plaintiff's deficiencies when they issued the notice. After all, if they were genuinely interested in improving performance they likely would have been much more specific. Of course, this is not to say that Defendants' actions were indeed retaliatory, but rather that a reasonable jury could conclude that they were. Thus, given the record, the court cannot conclude as a matter of law that Defendants would have disciplined Plaintiff absent her protected activity. There is ample doubt so as to allow a jury to decide this question.

## 5. First Amendment Summary

Because of the fractured, multi-layered nature of this opinion, it is useful for the court to summarize its decision on Plaintiff's First Amendment claims. As to those claims, the court concludes that there is a genuine issue of material fact about whether Plaintiff's complaint about Sergeant Brink's falsification of his police logs was within her official duties as a sergeant. There is insufficient evidence in the record for the court to definitely conclude that they were, thus, this is an issue that must be decided at trial. If these complaints were within her official duties then she

has not engaged in protected activity, and her First Amendment claims fail. If not, then there are other issues that must be resolved at trial. From the evidence in the record, the only retaliatory action that possibly followed from this protected activity was Defendants' written discipline of Plaintiff in May and June 2007. The court has concluded as a matter of law that none of the other alleged retaliatory acts—the 2006 denial of a promotion, the cancellation of Plaintiff's dog handling contract, and Defendants purported delay in granting Plaintiff's request for donated sick-time—are sufficient for various reasons stated above. In analyzing the May and June of 2007 discipline, the court concluded that there are genuine issues of material fact about whether this discipline would dissuade a person of ordinary firmness of asserting her rights under the First Amendment, whether Plaintiff's protected activity was a substantial factor for the alleged retaliation, and whether Defendants would have taken the same action absent Plaintiff's protected activity. Thus, the only First Amendment claim surviving summary judgment is whether Plaintiff's speech concerning the Brink incident was protected activity, and, if so, whether Defendant's May and June of 2007 discipline was in retaliation for this protected activity. The court will grant Defendant's motion for summary judgment as to all of Plaintiff's other alleged First Amendment claims.

> **B.** **Fourteenth Amendment**

In her Amended Complaint, Plaintiff asserts 14th Amendment equal protection and due process claims. (Doc. 27 ¶¶ 35, 37). However, in her brief in opposition to Defendant's motion for summary judgment, Plaintiff concedes that she has not made out a due process claim—either substantive or procedural—and, as such, the court will not address those claims here and will grant Defendant's motion for summary judgment on those claims. (Doc. 51 at 13.)

Plaintiff's brief in opposition to Defendant's motion for summary judgment also does not meaningfully address her equal protection claim. Rather than produce evidence in support of this claim, Plaintiff cites rambling conclusions of law and vague references to her Amended Complaint in support of her claim that Defendants violated the Equal Protection Clause of the 14th Amendment. For instance, Plaintiff alleges that she did not receive the promotion to Detective Sergeant "because of her gender." (Doc. 51 at 13.) Plaintiff provides no support for this contention other than her generalized belief. Stray comments and generalizations, without more, are insufficient to defeat summary judgment. *See Celotex Corp.*, 477 U.S. at 324 (stating that once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint). Plaintiff has adduced no evidence showing that there is a genuine issue for trial as to equal protection claims. Because Plaintiff conceded that she has no claims under the 14th Amendment's due process clause, and because she has failed to come forward with any evidence in support of her equal protection claim the court will grant Defendants' motion for summary judgment as all of Plaintiff's claims under the 14th Amendment.

### C.    Claims against Defendant Swatara Township

Defendants argue that all of the claims against Defendant Swatara Township should be dismissed because Plaintiff does not reference any policy, practice of custom of the Township that form that basis of her § 1983 claims. The court agrees. There is no *respondeat superior* liability under § 1983; rather, only when execution of a municipal policy or custom inflicts the injury is a municipal entity liable under § 1983. *See Monell v. Dept. of Social Servs.,* 436 U.S. 658, 694 (1978); *Rizzo v. Goode*, 423 U.S. 362, 377 (1978).

Here, Plaintiff's Amended Complaint is devoid of any allegations that a municipal policy or custom of Swatara Township was responsible for the alleged violation of her First or Fourteenth Amendment rights. Moreover, Plaintiff's brief in opposition to Defendants' motion for summary judgment does not address Defendants' *Monell* argument. A party waives an issue if it fails to brief it in its opening brief; the same is true for a party who merely makes a passing reference to an issue without elaboration. *See Gorum v. Sessions*, 561 F.3d 179, 185 n.4 (3d Cir. 2009) (citing *Laborers' Intern. Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue ... will not suffice to bring that issue before this court.'" (quoting *Simmons v. City of Phila.*, 947 F.2d 1042, 1066 (3d Cir.1991) (plurality opinion) (Becker, J.), *cert. denied*, 503 U.S. 985 (1992))). Given these gross deficiencies, the court will grant Defendant Swatara Township's motion for summary judgment on all counts.

### D. **Qualified Immunity**

Defendants Bogdanovic and Umberger argue that they are entitled to qualified immunity from all of Plaintiff's claims because "there is no evidence from which a jury can conclude that a reasonable official in these Officers' positions at the relevant time could have believed that their conduct was unlawful." (Defs.' Br. in Supp. of Mot. for Sum. J. at 28.)

When, as is the case here, an a government official's actions give rise to a § 1983 claim, the privilege of qualified immunity, in certain circumstances, can serve as a shield from suit. See Hunter v. Bryant, 502 U.S. 224, 227 (1991). The primary purpose of affording public officials the privilege of qualified immunity, thus insulating them from suit, is to protect them "from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway*, 510

U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). The privilege of qualified immunity, however, can be overcome when state officials violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. The Supreme Court, in *Saucier v. Katz*, explained the analytical process for determining when the privilege of qualified has been overcome:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

533 U.S. 194, 201 (2001) (citation omitted). Although the Supreme Court recently announced that *Saucier*'s two-step protocol is not mandatory, courts have the discretion to decide whether that procedure is worthwhile in particular cases. *Pearson v. Callahan*, ___ U.S. ____; 129 S.Ct. 808, 821 (2009)

When immunity is raised at the summary judgment stage, the court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for purposes of immunity. *See Gruenke v. Seip*, 225 F.3d 290, 299-300 (3d Cir.2000); *Russoli v. Salisbury Twp*., 126 F. Supp. 2d 821, 838-41 (E.D. Pa. 2000); see also *Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir.1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

## 1. **Violation of Constitutional Rights**

In their brief, the individual Defendants simply argue that "the undisputed facts of record demonstrate that Karchnak has not suffered any constitutional right." (Doc. 32 at 27-28.) The court disagrees. There is ample dispute about whether Plaintiff suffered a violation of her constitutional rights, and it is the nature of these disputes that creates a genuine issue of material fact for trial on that issue as well as whether Defendants are entitled to qualified immunity.

Specifically, the court has already found that there is a genuine issue of material fact concerning whether Plaintiff's First Amendment rights were violated. The court found in Part III.A.4.i.a., *supra*, that there is a genuine issue of material fact as to whether it was a part of Plaintiff's job duties to report the information that she knew about Brink's falsification of his police logs up the chain of command. If it was, then per *Garcetti*, Plaintiff has not engaged in First Amendment activity, and the entire house of cards supporting her claim of liability collapses; if not, then Plaintiff has engaged in protected activity, and moves onto the next step in her *prima facie* case. The court also found that there was a genuine issue of material fact concerning whether the May and June of 2007 discipline would dissuade a person of ordinary firmness of asserting her rights under the First Amendment, whether Plaintiff's protected activity was a substantial factor for the alleged retaliation, and whether Defendants would have taken the same action absent Plaintiff's protected activity. See Parts III.A.4.ii,iii,iv., *supra*. However, for purposes of qualified immunity, the court must resolve all doubts about whether a constitutional violation exists in the light most favorable to the party against whom it is asserted. *See Saucier,* 533 U.S. at 201. Doing that here, the court finds that for the purposes of qualified immunity analysis, Plaintiff has asserted a violation of her constitutional rights.

### 2. **Clearly Established Right**

Defendants do not argue that the right asserted by Plaintiff is not clearly established, perhaps because they could not. The court is deeply suspicious of any assertion that First Amendment retaliation claims are not clearly established. It has been well settled since at least 1968 that a public employee does not relinquish her First Amendment rights to comment on matters of public concern by virtue of her government employment. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Recently, the Supreme Court recognized the well-settled nature of this right in Garcetti: "[i]t is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti*, 547 U.S. at 413 (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983).) Defendants would be hard pressed to argue that these rights were not clearly established, and since they have not done so here the court will not belabor the point, and finds that the right to be free from retaliation for the exercise of protected First Amendment activity is clearly established.

### 3. **Summary**

Because the court resolved all doubts about the existence of a constitutional violation in favor of Plaintiff, and because the court found that the right asserted was clearly established the court will deny Defendants' motion for summary judgment on the issue of their entitlement to qualified immunity. Defendants may raise this issue again at trial if the evidence does not establish that Plaintiff engaged in protected First Amendment activity.

## IV. **Conclusion**

Based on the foregoing, the court will grant in part and deny in part Defendants' motion for summary judgment. The motion will be granted in full as to

Defendant Swatara Township. Plaintiff has adduced no evidence that Defendant Swatara Township itself violated her constitutional rights, and therefore failed to meet her burden in opposing summary judgment. As to Defendants Umberger and Bogdanovic, the court will grant their motion for summary judgment on Plaintiff's Fourteenth Amendment claims.

There is a genuine issue of material fact about whether Plaintiff's complaint about Sergeant Brink's falsification of his police logs was within her official duties as a Sergeant. There is insufficient evidence based on the record for the court to definitely conclude that they were; thus, this is an issue that must be decided at trial. If these complaints were within her official duties then she has not engaged in protected activity and her First Amendment claims fail. If not, then there are other issues that must be resolved at trial. From the evidence in the record, the only retaliatory action that possibly followed from this protected activity was Defendants' written discipline of Plaintiff in May and June 2007. The court has concluded as a matter of law that none of the other alleged retaliatory acts—the 2006 denial of a promotion, the cancellation of Plaintiff's dog handling contract, and Defendants purported delay in granting Plaintiff's request for donated sick-time—are sufficient for various reasons stated above. In analyzing the May and June of 2007 discipline, the court concluded that there are genuine issues of material fact about whether this discipline would dissuade a person of ordinary firmness of asserting her rights under the First Amendment, whether Plaintiff's protected activity was a substantial factor for the alleged retaliation, and whether Defendants would have taken the same action absent Plaintiff's protected activity. Thus, the only First Amendment claim surviving summary judgment is whether Plaintiff's speech concerning the Brink's incident was protected activity, and, if so, whether Defendant's May and June of 2007 discipline was in retaliation for this protected

46

activity.  The court will grant Defendant's motion for summary judgment as to all of Plaintiff's other alleged First Amendment claims.  The court will deny without prejudice Defendants' motion for summary judgment on the issue of qualified immunity.

    s/Sylvia H. Rambo     
United States District Judge

Dated: July 10, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CAROL KARCHNAK,　　　　　　　:　　No. 07-CV-1405
　　　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiff　　　　　　:　　JUDGE SYLVIA H. RAMBO
　　　　　　　　　　　　　　　　　　:
　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
SWATARA TOWNSHIP,　　　　　　:
DAVID BOGDANOVIC,　　　　　　:
JASON D. UMBERGER, and　　　　:
COMMISSIONER RICCI,　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　Defendants　　　　　:

O R D E R

In accordance with the accompanying memorandum of law, **IT IS**
**HEREBY ORDERED THAT:**

(1)  Defendant's motion for summary judgment, (Doc. 31), is
**GRANTED** in part and **DENIED** in part, as follows:

A. The motion is **GRANTED** in all respects as to Defendant
Swatara Township;

B.  The motion is **GRANTED** as to Defendants Bogdanovic and
Umberger as to all of Plaintiff's claims under the 14th Amendment;

C.  The motion is **DENIED** as to Plaintiff's claims under the
First Amendment arising out of Plaintiff's speech concerning Sergeant
Donald Brink's falsification of his police logs, and the May and June of
2007 discipline that followed; and

D.  The motion is **GRANTED** as to all other claims for liability
under the First Amendment.

E.  The motion is **DENIED WITHOUT PREJUDICE** on the
issue of Defendants' claim of qualified immunity.

(2) Consistent with footnote 3 in the accompanying memorandum, Defendants shall file with the clerk of court a corrective entry to the exhibits attached to Document 32, so that those exhibits match the pagination and numbering of the courtesy copy of the exhibits supplied by Defendants' attorney to the court.

(3) The clerk of court shall defer entry of judgment until after trial in this matter.

(4) In the near future, the court will issue a new scheduling order setting a date for trial, as well as an order addressing the pending motions in limine. (Docs. 36, 38, 40, 42, and 44.)

s/Sylvia H. Rambo
United States District Judge

Dated:  July 10, 2009.